UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

CARMELITA LEBLANC,

Plaintiff,

v.

THOMAS JEFFERSON UNIVERSITY
HOSPITALS, INC. d/b/a/ JEFFERSON
CHERRY HILL HOSPITAL,

Defendant.

Civil Action

No. 1:21-CV-12735-KMW-MJS

**OPINION**

David M. Koller, Esquire
Jordan D. Santo, Esquire
Koller Law, LLC
2043 Locust Street, Suite 1B
Philadelphia, PA 19103

*Counsel for Plaintiff Carmelita LeBlanc*

Eric B. Meyer, Esquire
FisherBroyles, LLP
One Liberty Place
1650 Market Street
Philadelphia, PA 19103

*Counsel for Defendant Kennedy University Hospital, Inc.*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

Plaintiff Carmelita LeBlanc ("Plaintiff") brings this action against her former employer,

Kennedy University Hospital, Inc. d/b/a Jefferson Health New Jersey ("Jefferson"), alleging that

Jefferson discriminated and retaliated against her in violation of the Family and Medical Leave

1

Act (the "FMLA"), 29 U.S.C. §§ 2601 *et seq.*, the Americans with Disabilities Act (the "ADA"),

42 U.S.C. §§ 12101 *et seq.*, and the New Jersey Law Against Discrimination (the "NJLAD"),

N.J.S.A. §§ 10:5-1, *et seq.*[1]

Presently before the Court is Jefferson's Motion for Summary Judgment brought pursuant

to Fed. R. Civ. P. 56, which Plaintiff has opposed. For the reasons set forth more fully below,

Jefferson's Motion is granted.

## II.      BACKGROUND

This matter arises from Jefferson's termination of Plaintiff's employment in July 2020.

Plaintiff began her employment with Jefferson in May 2015 as a nurse manager in the hospital's

intensive care unit ("ICU") and the intermediate care unit ("IMC"). *See* Def.'s Statement of

Material Facts ("Def.'s SMF") ¶ 1. At all relevant times, Plaintiff reported directly to Frank Rocco

("Rocco"), corporate director of nursing. *See id.* ¶ 5.

### A.  Plaintiff's Medical Leave of Absence

In or around September 2019, Plaintiff was informed by her physician that she required

knee-replacement surgery to treat her severe arthritis, which would require her to be away from

work for approximately twelve weeks. *See id.* ¶¶ 17–18. Plaintiff's surgery was initially scheduled

for November 2019, but was twice postponed. *See id.* ¶ 19. Each time Plaintiff's surgery was

scheduled, she requested a medical leave of absence from Jefferson's third-party administrator,

AbSolve Leave Administration ("Absolve"), who reviews employee FMLA requests and

administers Jefferson's short-term disability program. *See id.* ¶ 20. Each time Plaintiff's surgery

was scheduled, she requested a three-month leave of absence and was approved without difficulty.

---

[1] Plaintiff's Complaint misidentifies Jefferson as "Thomas Jefferson University Hospitals, Inc. d/b/a Jefferson Cherry Hill Hospital."

*See id.* ¶¶ 21–22. Ultimately, Plaintiff was approved for and took an FMLA leave of absence beginning on February 29, 2020. *See id.* ¶ 24.

### B.  **Plaintiff's Managerial History**

Long before Plaintiff required knee surgery, Jefferson had received complaints from Plaintiff's co-workers and subordinates that she was hostile and unprofessional.[2] *See id.* ¶ 32. As early as 2016, Plaintiff's subordinates submitted internal complaints to Jefferson that Plaintiff was hostile toward her staff.  *See id.* Jefferson repeatedly made Plaintiff aware of these reports and counseled her on her behavior. *See id.* ¶ 33.[3] Plaintiff had also been made aware of survey data in the years prior to her medical leave demonstrating that employee engagement and satisfaction in her units were declining in her units. *See* Def.'s Ex. A ("Pl.'s Dep. Tr.") at 88:17–90:10; 91:9–96:5.

In early 2020, Rocco learned that employees under Plaintiff's management had begun leaving, which presumably explained an inordinately high rate of employee turnover specific to the units she managed. *See id.* ¶ 35. In February 2020, one of Plaintiff's subordinates, Lauren

---

[2] Pursuant to L. Civ. R. 56.1(a), the non-moving opponent to a motion for summary judgment is required to furnish a responsive statement that "address[es] each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion." Here, rather than indicate such agreement or disagreement, an alarming number of Plaintiff's Responses to Jefferson's Statement of Material Facts appear to avoid admitting the truth of the facts asserted. For example, rather than admit that Plaintiff had a history of "yelling at her staff" or that Jefferson had indeed "received complaints from [Plaintiff's] co-workers and subordinates," Def.'s SMF ¶ 32, Plaintiff indicates that these facts are "[u]ndisputed," but only "insofar as Mr. Rocco testified to said complaints," Pl.'s Resp. ¶ 32. In this Response, and others like it, Plaintiff also offers irrelevant facts and arguments as to why the Court should accord little weight to the facts asserted. *See, e.g.*, Pl.'s Resp. ¶ 32 (noting separately that "Mr. Rocco never [personally] observed Plaintiff yell at her staff"). Thus, to the extent Plaintiff has failed to clearly admit or deny Jefferson's Statement of Material Facts, said facts shall be deemed undisputed. *See* L. Civ. R. 56.1(a) (warning that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion")

[3] Plaintiff states that it is "[u]ndisputed [that] Mr. Rocco testified to said counselings, but disputed as to it actually occurring." Pl.'s Resp. ¶ 33. But during her deposition, Plaintiff herself conceded numerous instances in which she was informed of employee complaints and counseled on her management style—all of which occurred in the years prior to her first request for medical leave. *See* Pl.'s Dep. Tr. at 77:4–21; 78:1–7; 78:19–79:1; 80:11–81:21; 81:14–17; 94:12–96:6.

Ciocco ("Ciocco"), prepared a memorandum that described some of the negative encounters that were occurring between Plaintiff and the nurses. *See* Def.'s SMF ¶ 36. The memo documented reports from several nurses who explained that they had "a fear of being written up or yelled at for doing something wrong." Def.'s Ex. 8 at 1. In addition, Ciocco personally explained that she did not feel supported by Plaintiff, and stated that she had witnessed Plaintiff "become reactive to a situation in front of the nurses and various other interdisciplinary team members, [which] often comes off as if she is yelling to them." *Id.*

In light of these complaints and the employee turnover in Plaintiff's units, Rocco communicated these issues to Jefferson's human resources business partner, Jennifer Knopple ("Knopple"). *See* Def.'s SMF ¶ 39. Thereafter, Knopple interviewed two nurses under Plaintiff's supervision as part of her investigation into the employee complaints. *See id.* ¶ 40. During an exit interview, one of the nurses reported to Knopple that she felt that she was walking on eggshells under Plaintiff's supervision. *See id.* ¶ 41. In addition, the nurse also reported that morale in her unit was bad because Plaintiff was always yelling, which in turn created a lot of pressure. *See id.*

## C. **The Corrective Action Plan**

Following the investigation, Rocco—in consultation with his supervisor and Knopple—made the decision to take corrective action to address Plaintiff's behaviors toward her staff. *See* Def.'s Ex. B ("Rocco Dep. Tr.") at 97:10–17. Thereafter, Rocco met with Plaintiff on February 26, 2020, and they discussed the decision to place Plaintiff on a corrective action plan (the "CAP"). *See* Def.'s SMF ¶ 45. However, because Plaintiff's FMLA leave was to commence on February 29, 2020, it was decided that the CAP would not be formally developed or implemented until after she returned to work. *See id.* ¶ 49. In the interim, Rocco prepared an outline of the goals the CAP would ultimately embody, which sought to "ensure that [Plaintiff] is using coaching techniques

and collaborating with the staff when they are being held accountable to follow policies and procedures," as well as identify "techniques on how [she] can improve her listening skills while communicating with her staff." Def.'s Ex. 10; *see also* Def.'s SMF ¶ 47. Plaintiff agreed that Rocco's outline accurately reflected Jefferson's expectations and the goals of improving her management style. *See* Def.'s SMF ¶ 46.

Plaintiff ultimately took leave as planned, received her surgery, and returned to work, without any physical restriction, on May 24, 2020. *See id.* ¶¶ 29–30. On May 26, 2020, Rocco and Plaintiff met to further discuss and develop the CAP, with Plaintiff's input. *See* Def.'s Ex. 12; *see also* Def.'s SMF ¶ 50. The final CAP implemented measures and training designed to improve Plaintiff's interpersonal and communication skills, all of which were to be completed within thirty days. *See id.* ¶ 57. The CAP also required, among other things, that Plaintiff complete three online courses entitled "Emotional Intelligence," "Enhance Your Listening Skills," and "Building a Team Based on Trust." Def.'s Ex. 12 at 3.

Plaintiff was agreeable to the CAP and was committed to working on her management issues. *See* Def.'s SMF ¶ 52. As Plaintiff worked to complete the CAP, Rocco met with Plaintiff weekly; conducted patient rounds with her; and provided her with textbooks, videos, and other educational resources geared toward fostering positive communication. *See id.* ¶ 57. Ultimately, Plaintiff completed the required training and successfully met the goals of the CAP within the required time. *See id.* ¶ 59. Both Plaintiff and Rocco consider the CAP to have been a positive experience. *See id.* ¶ 61

### D.  The Patient Abuse Incident

On the morning of July 1, 2020, it was reported that a traveling ICU nurse had abused a patient at the hospital. *See id.* ¶ 62. While the specific details of the reported abuse or not apparent

on the face of the record, it does appear to have been exceptional. On a 1-to-10 scale—with "10" being "the most serious incident [ ] one has experienced," and "1" being "this is [ ] absolute[ly] nothing"—Plaintiff ranked the abuse as a "10." *Id.* ¶ 65. Plaintiff could not recall another occasion as a nurse manager at Jefferson where a nurse was reported as being aggressive or abusive with a patient. *See id.* ¶ 66.

Plaintiff later explained that upon learning of the reported abuse, her "first thought" was "the risk to the nurse," namely "being accused of [abuse] and the implications for her career." Pl.'s Dep. Tr. 153:14–21. Thus, rather than report the incident to Rocco, as she knew was required, Plaintiff instead took it upon herself to conduct her own investigation. *See* Def.'s SMF ¶ 67. Plaintiff in fact had an opportunity to report the incident to Rocco when he called her to discuss an unrelated matter. *See id.* ¶ 72. Still then, Plaintiff, did not disclose the abuse, but rather told Rocco that she could not talk because of "an (unspecified) issue." *Id.*

Plaintiff continued her investigation and interviewed the traveling nurse at approximately 10:30 a.m. *See id.* ¶ 82. Shortly thereafter, Plaintiff contacted Knopple to alert her to the report of patient abuse. *See id.* ¶ 83. In turn, Knopple directed Plaintiff to send the traveling nurse home pending an investigation. *See id.* ¶ 84. Plaintiff, however, ignored this directive, and instead permitted the traveling nurse to stay at the hospital. *See id.* ¶ 89. Plaintiff did so despite knowing that sending the nurse home would have "optimized the patient-safety issue." *Id.* ¶ 90. Plaintiff never informed Knopple that she would not be sending the nurse home.

By midday—hours after Plaintiff first learned of the reported abuse—Rocco was informed of the patient abuse by Diane Juliano, Jefferson's corporate director of nursing. *See id.* ¶ 102. In turn, Rocco contacted Plaintiff to ask what had happened. This was the first time that Plaintiff informed Rocco of the abuse. *See id.* ¶ 104. As to why Plaintiff had not contacted Rocco sooner,

Plaintiff later explained that it had "slipped [her] mind." *Id.* ¶ 107. When Rocco asked Plaintiff what human resources had recommended, Plaintiff did not inform him of Knopple's directive. *See id.* ¶ 110. Rather, Plaintiff explained that she had allowed the nurse to complete her shift because it was a "he said/she said" situation and that "we can't really get a direct story." *See id.* ¶ 110.

### E.  Plaintiff's Termination

The following day, Rocco met with Plaintiff to discuss her handling of the patient abuse incident, during which time Rocco learned that Plaintiff had not been truthful concerning the incident or Plaintiff's independent investigation. *See id.* ¶ 111. Rocco likewise learned that Plaintiff had elected to allow the nurse to stay in contravention of Knopple's directive. *See id.* ¶ 113. Beyond Plaintiff's lack of candor, Rocco also expressed concern that Plaintiff, by declining to send the nurse home, had not made patient safety her first priority. *See id.* ¶ 115.

Following their meeting, Rocco suspended Plaintiff pending an investigation. *See id.* ¶ 119. Jefferson subsequently confirmed that Plaintiff had, among other things, ignored Knopple's directive and failed to escalate the report, as was required of her. Jefferson's assistant vice president of human resources, Julie Ellis ("Ellis"), learned of the situation and recommended that Plaintiff be terminated. *See id.* ¶ 123. Rocco, in consultation with Jefferson's upper management, accepted and supported the recommendation to terminate Plaintiff. *See id.* ¶ 124.

Plaintiff was terminated on July 8, 2020. *See id.* ¶ 125. In a subsequent termination letter addressed to Plaintiff, Jefferson cited to her mishandling of the patient abuse report, as well as her "poor management judgement." Def.'s Ex. 15.

7

### F.   The Instant Action

Plaintiff commenced this action by filing her Complaint on June 18, 2021. (ECF No. 1). Plaintiff generally maintains that her handling of the patient abuse incident was not the real reason for her termination. Rather, Plaintiff alleges that her termination was in retaliation for her having sought out and taken a medical leave of absence. In addition, Plaintiff also accuses Jefferson of discriminatorily discharging her on the basis of an actual and/or perceived physical disability in connection with her knee surgery. On these bases, Plaintiff asserts three claims for retaliation under the FMLA, the ADA, and the NJLAD (Counts I, IV, V), as well as two claims for disability discrimination under the ADA and the NJLAD (Counts II, III).

## III.   STANDARD OF REVIEW

A court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir. 1983). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come

forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion

for summary judgment, the nonmoving party must identify specific facts and affirmative evidence

that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256–57. "A nonmoving

party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap*

*Rock Indus., Inc. v. local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992)

(quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion

for summary judgment, the court views the facts and all reasonable inferences drawn from the

facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at

587.

## IV.   DISCUSSION

### A.   Plaintiff's Retaliation Claims

The Court first addresses Plaintiff's claims for retaliation under the FMLA, the ADA, and

the NJLAD, all of which allege that Jefferson terminated Plaintiff in retaliation for her having

sought out and taken a medical leave of absence for her knee surgery. *See id.* ¶¶ 62–63, 89–90,

93–94. Each of these retaliation claims is governed by the three-step, burden-shifting regime

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lichtenstein v. Univ.*

*of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012); *Stouch v. Twp. of Irvington*, 354 F.

App'x 660, 667 (3d Cir. 2009); *Craig v. Suburban Cablevision*, Inc., 140 N.J. 623, 629–30, 660

A.2d 505 (1995).

At the summary judgment phase, Plaintiff bears the initial burden of establishing a *prima*

*facie* case of retaliation. *See Lichtenstein*, 691 F.3d at 301–02; *see also Krouse v. Am. Sterilizer*

*Co.*, 126 F.3d 494, 500 (3d Cir. 1997). To make out a *prima facie* claim for retaliation under the

FMLA, the ADA, or the NJLAD, Plaintiff must show that she (1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) that there is a causal connection between the protected activity and the adverse action. *See Holmes-Mergucz v. Cellco P'ship*, No. 18-11816, 2021 WL 3163985, at *4 (D.N.J. July 27, 2021), *aff'd*, No. 21-2617, 2022 WL 16545589 (3d Cir. Oct. 31, 2022); *see also Krouse*, 126 F.3d at 500.[4] If Plaintiff succeeds, the burden then shifts to Jefferson to articulate a legitimate, non-retaliatory reason for its decision to terminate her. *See Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015). If Jefferson advances such a reason, the burden shifts back to Plaintiff to demonstrate that Jefferson's "proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.*

Here, Jefferson argues that Plaintiffs' retaliation claims fail because she cannot satisfy the third prong of her *prima facie* burden, namely a causal nexus between her termination and her medical leave.[5] "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997). Generally speaking, a plaintiff may demonstrate causation in three ways. First, a plaintiff may show "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). Second, "a plaintiff can [also] establish a link between his or her protected behavior

---

[4] Under the FMLA, Plaintiff's *prima facie* burden differs in two minor respects. First, the "protected activity" anticipated by the first prong is the invocation of one's right to FMLA-qualifying leave. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301-02 (3d Cir. 2012). As for the third prong, the Third Circuit has applied a "lessened causation standard requiring plaintiffs to show only that the use of FMLA leave was a 'negative factor' in the adverse employment decision." *DiFiore v. CSL Behring*, LLC, 879 F.3d 71, 78 (3d Cir. 2018). However, as explained further *infra*, Plaintiff fails to make out such a nexus, even under this more diluted standard.

[5] Alternatively, Jefferson argues that Plaintiffs' ADA and NJLAD retaliation claims fail for lack of "protected activity" because her request for FMLA leave did not concurrently constitute a "request for reasonable accommodation." Def.'s Br. at 21–23. However, because all of Plaintiff's *prima facie* retaliation claims fail for want of a causal nexus, the Court need not address this argument.

and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." *Id.* Lastly, a plaintiff may point to the proffered evidence which, when looked at "as a whole," suggests "that the employer had a retaliatory animus when taking the adverse action." *Daniels*, 776 F.3d at 196; *Kachmar*, 109 F.3d at 177; *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000).

At the outset, the Court first finds that the time between Plaintiff's termination and her medical leave does not reasonably imply retaliatory animus. When the temporal proximity between the protected activity and adverse action is "unduly suggestive," this "is sufficient standing alone to create an inference of causality and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). Here, Plaintiff returned from her medical leave on May 24, 2020, and was subsequently terminated on July 6, 2020. But this six-week intervening period, standing alone, is not "unduly suggestive" of retaliatory intent. *See Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (holding that a three-week interval was not unduly suggestive). In fact, this interval becomes all the more remote when considering that Plaintiff's first request for leave came approximately ten months before her termination. *See LeBoon*, 503 F.3d at 233 (holding as a matter of law that a "gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment"); *see also Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (holding that a lapse of over two months between protected activity and adverse employment action "is not so close as to be unduly suggestive" of retaliation).

In the absence of temporal proximity, the Court next considers whether Plaintiff can show that Jefferson engaged in an intervening pattern of antagonism. To succeed under this theory of causation, a plaintiff must put forth specific evidence demonstrating that the employer engaged in

11

a series of hostile actions, such as a "constant barrage of written and verbal warnings . . . and disciplinary action[s]." *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993). A pattern of antagonism, however, entails more than a mere series of disciplinary actions; rather, a plaintiff must "offer [a] basis for linking the disciplinary actions to her [protected activity]." *Barton v. MHM Correctional Servs., Inc.*, 454 F. App'x. 74, 79 (3d Cir. 2011). Here, Plaintiff offers no such proof.

In her Opposition to Jefferson's Motion, Plaintiff claims that her placement on the CAP was a "sham" designed "to set [her] up for failure." Pl.'s Br. at 8. More specifically, Plaintiff reasons that the CAP evidences Jefferson's supposed resentment of her medical leave and, by extension, infers that Jefferson had a retaliatory motive when it terminated her employment.[6] Ignoring for a moment that a single instance of antagonism does not constitute a "pattern," the notion that the CAP was at all "antagonistic" is completely belied by the record. Above all, it is inconsistent with Plaintiff's prior admissions. Indeed, Plaintiff's deposition testimony reveals that she had, to the contrary, regarded the CAP as an overall positive experience, and one from which she believes to have actually benefited. *See* Def.'s SMF ¶¶ 58, 61. What is more, when asked whether she had "any reason to believe that Mr. Rocco did not intend for [her] to succeed at Jefferson," Plaintiff responded, "[N]o. I didn't feel that." Pl.'s Dep. Tr. at 228:4–8. The Court simply fails to see how the CAP was somehow designed "to set [her] up for failure" when Plaintiff unequivocally acknowledges the goals of the CAP. Consequently, Plaintiff fails to point to any instance of intervening antagonism, much less establish a pattern of the same. *Cf. Robinson*, 982 F.2d at 895 (finding a pattern of antagonism where plaintiff was subject to a "constant barrage of

---

[6] To be clear, Plaintiff does not claim that the CAP constitutes an "adverse employment action" such that it is independently actionable or otherwise relied upon to satisfy her *prima facie* burden for her retaliation claims. Rather, Plaintiff only cites to the CAP insofar as it can potentially infer a causal connection between her medical leave of absence and her ultimate termination.

written and verbal warnings . . . , inaccurate point totaling, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge." (ellipses in original) (internal quotation marks omitted)).

Lastly, the Court assesses whether the evidence, taken as a whole, can infer that Jefferson harbored a retaliatory motive when it terminated Plaintiff's employment. *Daniels*, 776 F.3d at 196. To this end, Plaintiff offers two primary arguments, both of which pivot on the fact that Jefferson informed Plaintiff of the CAP shortly before her leave was to begin.

Plaintiff first submits that the timing of Jefferson's notice—coupled with "ensuing stressful thoughts" she claims to have had subsequently—implies that her ultimate termination was retaliatory. More specifically, Plaintiff reasons that Jefferson should have "waited until Plaintiff's return to discuss these issues"—the fact that it did not, at a time when Plaintiff needed to "focus on her health," thus implies that Jefferson was "set[ting] up Plaintiff's employment to end." Pl.'s Br. at 8. Reduced to its core, Plaintiff's argument seems to suggest (1) that the timing of Jefferson's notice is proof that it callously intended for her medical leave to be a stressful one, and that from this intent (2) it can be inferred that Jefferson's reason for terminating Plaintiff months later was in retaliation for her having taken the leave in the first place.[7]

This argument is as attenuated as it is baseless. In making this argument, Plaintiff cites to absolutely no evidence suggesting how this might be true, much less plausible. To the contrary, the record evidence quite clearly demonstrates that her termination had nothing to do with either the CAP or her medical leave. First, it is quite obvious that the CAP was not arbitrary or unwarranted. Rather, it was occasioned by numerous employee complaints—all of which were brought to Jefferson's attention in the face of an inordinately high rate of employee turnover in

---

[7] The Court reiterates that Plaintiff has not claimed that the CAP was an adverse employment action.

Plaintiff's units specifically. Furthermore, the issues raised in these complaints—namely Plaintiff's hostile and unprofessional management style—had actually pre-dated Plaintiff's need for knee surgery. Under these circumstances, the timing of Jefferson's notice was perfectly sensible. The fact that Jefferson delayed implementing the CAP until after Plaintiff's leave more readily evidences efforts to accommodate Plaintiff's leave.

Plaintiff's second argument is equally unpersuasive. Pointing again to the timing of Jefferson's notice of the CAP, Plaintiff attempts to infer that Jefferson was "biding its time awaiting any opportunity to paint Plaintiff as a bad employee and terminate her." Pl.'s Br. at 8. This argument might be more persuasive had Plaintiff actually been terminated for any of the behavioral issues referenced in the CAP. Apparently anticipating this deficiency, Plaintiff attempts to bridge the gap by arguing that she was ultimately terminated "for concerning herself with the very thing that was the reason for her [CAP]"—"poor leadership." *Id.* But chalking up the reason for Plaintiff's termination as mere "poor leadership" is misleading. To be clear, Plaintiff was terminated for, among other things, ignoring an employer directive and mishandling a report of severe patient abuse. Without more, the unsupported notion that Jefferson was somehow "biding its time" to "paint Plaintiff as a bad employee" amounts to nothing more than baseless conjecture and is insufficient to survive summary judgment. *See Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat a motion for summary judgment.").

In conclusion, there simply is no evidence from which a reasonable jury could find that Plaintiff's termination was at all related to her requesting or taking a medical leave of absence.

Because Plaintiff cannot satisfy a critical element of her *prima facie* burden, the Court hereby grants Jefferson's Motion for Summary Judgment as to Plaintiff's retaliation claims.[8]

## B.  Discrimination Claims

The Court next turns to Plaintiff's claims for disability discrimination under the ADA and the NJLAD. Here, Plaintiff claims that she was actually and/or perceived as physically disabled, and that this was Jefferson's true reason for terminating her employment. *See* Compl. ¶¶ 67–70, 78–81.

Claims for disability discrimination under the ADA and the NJLAD are analyzed under the same, burden-shifting same framework announced in *McDonnel Douglas. See Stewart v. Cty. of Salem*, 274 F. Supp. 3d 254, 259 (D.N.J. 2017). Here, Jefferson does not argue that Plaintiff has failed to establish *prima facie* claims for disability discrimination under either statute.[9] Nor has Plaintiff challenged Jefferson's ability to articulate a legitimate, non-discriminatory reason for terminating her. As such, the only matter before the Court is whether Plaintiff can demonstrate that Jefferson's proffered reason for her termination was mere pretext for actual discrimination.

In her Opposition to Jefferson's Motion, Plaintiff offers no new facts, evidence, or argument beyond what she previously articulated in connection with her *prima facie* burden for her retaliation claims. Indeed, Plaintiff simply directs the Court "to the same logic and reasoning regarding her argument for causation." Pl.'s Br. at 10. As with her causation argument, Plaintiff likewise here insists that "inferences could be drawn in favor of" pretext from a vaguely described

---

[8] Separately, the Court notes that even if Plaintiff could make out *prima facie* claims for retaliation, such claims would nevertheless fail at the pretext stage for the same reasons her disability discrimination claims fail. *See* Part IV(B), *infra.*

[9] Jefferson maintains that Plaintiff's ability to establish *prima facie* claims for disability discrimination "is immaterial because she cannot prove that her termination of employment was pretextual." Def.'s Br. at 24. The Court agrees.

"air of waiting for Plaintiff to screw up just so [Jefferson] could fire her." Pl.'s Br. at 11. This is quite clearly inadequate.

In general, a plaintiff establishes pretext by submitting evidence which (1) "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication"; or (2) "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Terry v. Town of Morristown*, 446 F. App'x 457, 461 (3d Cir. 2011) (internal quotation marks omitted). However, it is not enough to show that an employer's decision was simply "wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (citing *Fuentes*, 32 F.3d at 765) (internal quotation marks omitted). Rather, the plaintiff must uncover "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation that would allow a reasonable factfinder to believe that the employer did not truly act for the asserted reason. *Fuentes*, 32 F.3d at 765.

Here, Plaintiff has failed to offer any evidence from which a reasonable jury could conclude that Jefferson's proffered reason for terminating Plaintiff was "not merely wrong, but that it was so plainly wrong that it cannot have been [Jefferson's] real reason." *Kautz*, 412 F.3d at 467. The undisputed record evidence suggests anything but a discriminatory motive. To the contrary, it suggests that Plaintiff's termination was not only completely legitimate, but warranted.

Further, the bases for Plaintiff's termination have been legitimized by her own deposition testimony, in which she, among other things, (1) acknowledged that she did not "know how Jefferson want[ed] that investigation [to be] conducted," Pl.'s Dep. Tr. at 153:1–5; (2) recognized

that she had, prior to this incident, "never before conducted an investigation into an allegation that a nurse was abusing a patient" at Jefferson, *id.* at 151:8–13; (3) admitted that she should have "immediately picked up the phone and called Mr. Rocco," *id.* at 158:15–21; (4) stated that her "first" and "primary" thought was "the risk to the nurse . . . being accused of this [abuse] and the implications for her," rather than patient safety, *id.* at 153:14–25; (5) conceded that sending the nurse home would have "optimized" the patient's safety, *id.* at 216:13–16; (6) acknowledged that she failed to do so in the face of Knopple's unambiguous directive to "send the nurse home," *id.* at 188:1–7; (7) accepted responsibility for failing to advise Knopple that she would not be sending the nurse home, *id.* at 210:20–25; and (8) admitted that she did not inform Rocco of the patient abuse until hours after it had first been reported, *id.* at 212:18–21. Any one of these reasons is clearly legitimate on its face.

These failures were not the result of simple "poor leadership." Nor did they occur in a vacuum. They were, quite to the contrary, grave lapses in judgment. What is more, they occurred in connection with a report of patient abuse that was, by Plaintiff's own measure, "the most serious" report of patient abuse she had ever encountered. It is inconceivable that Jefferson might have found her failings more acceptable had Plaintiff not been, as she claims, actually and/or perceived as disabled. To the extent Plaintiff raises any doubts, she swiftly dispels them where she concedes the wisdom of the very act that would have undoubtedly prevented her termination and this entire dispute—"[I]n retrospect . . . I should have sent the nurse home." *Id.* at 189:4–190:8.[10]

---

[10] *See also* Pl.'s Dep. Tr. at 160:10–15 ("[T]o do this right, I probably just would have sent the [nurse] home.").

## V.      CONCLUSION

For all of the reasons articulated above, Jefferson's Motion for Summary Judgment is granted.

Dated: March 31, 2023                                   /s/ *Karen M. Williams*
                                                        KAREN M. WILLIAMS
                                                        United States District Judge